2502

CAROLINA CHEMICAL EQUIPMENT COMPANY, INC., Respondent-Appellant v. Daniel B. MUCKENFUSS and Energen of Carolina, Inc., Appellants-Respondents.

(471 S.E. (2d) 721)

Court of Appeals

*Richard B. Watson* and *Cherie W. Blackburn,* both of *Nelson, Mullins, Riley & Scarborough,* Charleston, *for appellants-respondents.*

*Stephen P. Groves, W. Jefferson Leath, Jr.,* and *Edward D. Buckley,* all of *Young, Clement, Rivers & Tisdale,* Charleston, *for respondent-appellant.*

Heard Jan. 10, 1996.

Decided Apr. 22, 1996; Reh. Den. June 20, 1996.

CONNOR, Judge:

The action was one for intentional interference with contractual rights, misappropriation of trade secrets, and breach of contract. Muckenfuss appeals the denial of his motions for directed verdict and for judgment notwithstanding the verdict on the trade secrets cause of action. He and Energen both appeal the issuance of a five-year injunction prohibiting them from selling certain products in Charleston County. Carolina Chemical Equipment Company, Inc. also appeals the issuance of the injunction, and the denial of its motions for a new trial *nisi additur,* new trial absolute, and judgment notwithstanding the verdict on the misappropriation of trade secrets cause of action. We reverse and remand.

## FACTS

Energen and Carolina Chemical both sell industrial cleaning equipment and supplies. Muckenfuss was one of three shareholders of Carolina Chemical from 1982 until 1989. In August 1989, the other two shareholders voted Muckenfuss out. Muckenfuss sold his stock back to Carolina Chemical under the terms of a Stock Redemption Agreement. This agreement included a covenant not to compete and a cove-nant not to disclose trade secrets. In order to comply with the agreement, Muckenfuss refrained from selling cleaning equipment and supplies from August 1989 until March 1991, when he went to work for Energen.

Energen had been selling industrial cleaning supplies in competition with Carolina Chemical since Energen's inception in 1976. Carolina Chemical claims Muckenfuss disclosed trade secrets to Energen. In June 1991, Carolina Chemical obtained a preliminary injunction prohibiting Muckenfuss and Energen

from divulging trade secrets or from selling products made from those secrets to anyone who was not a customer of Energen's prior to March 15, 1991.

This case has been tried by a jury twice. Both times the jury returned a verdict for the Carolina Chemical but awarded no damages.[1] After the second verdict, the judge instructed the jury to either find some amount of damages, or find in favor of Energen and Muckenfuss. They then awarded Carolina Chemical $37,500 for violation of trade secrets, and $37,500 for breach of contract. They found for Muckenfuss and Energen on interference with a contract. Thereafter, the trial judge enjoined Muckenfuss and Energen from selling four products in Charleston County for five years.

## ANALYSIS

Muckenfuss first argues the trial judge erred in denying his motions for a directed verdict and for judgment notwithstanding the direct on the breach of contract cause of action because in this instance the covenant not to disclose trade secrets is really a covenant not to compete.

When reviewing the denial of motions for directed verdict or judgment notwithstanding the verdict, we must consider the evidence in the light most favorable to the non-moving party. *Brady Dev. Co. v. Town of Hilton Head Island*, 312 S.C. 73, 439 S.E. (2d) 266 (1993). A directed verdict or judgment notwithstanding the verdict should not be granted unless only one reasonable inference can be drawn from the evidence. *Id.*

At early common law, any agreement in restraint of trade was void as against public policy. *Standard Register Co. v. D.C. Kerrigan*, 238 S.C. 54, 119 S.E. (2d) 533 (1961). The agreement at issue in *Standard* included the following covenant not to compete:

The sales representative further agrees, for a period of two years after leaving the employment of the Company, that he will not engage, directly or indirectly, in competition with said Company in selling to the accounts or in the

---

[1] Following the first trial, the court granted Carolina Chemical a new trial absolute, holding the verdicts inconsistent because the jury was required to find damages if it found in favor of Carolina Chemical.

territory in which he has been performing his duties as such sales representative.

*Id.* at 58-59, 119 S.E. (2d) at 536. Our Supreme Court upheld this restriction as reasonable, noting the evolution of the law:

"Such [noncompetition agreements] were regarded with high disfavor under the old common law. And they are so regarded, in general, by modern courts, though apparently with some amelioration of the ancient disfavor. Modern courts have usually, in passing on these contracts, employed tree criteria: (1) Is the restraint, from the standpoint of the employer, reasonable in the sense that it is no greater than is necessary to protect the employer in some legitimate business interest? (2) From the standpoint of the employee, is the restraint reasonable in the sense that it is not unduly harsh and oppressive in curtailing his legitimate efforts to earn a livelihood? (3) Is the restraint reasonable from the standpoint of a sound public policy?"

*Id.* at 60, 119 S.E. (2d) at 536 (citations omitted). Noncompetition agreements, which must be supported by valuable consideration, will be critically examined and construed against the employer. *Rental Uniform Service of Florence, Inc. v. Dudley*, 278 S.C. 674, 301 S.E. (2d) 142 (1983); *Oxman v. Sherman*, 239 S.C. 218, 122 S.E. (2d) 559 (1961).

The Stock Redemption Agreement underlying this litigation contains a paragraph titled "Covenant Not to Divulge Trade Secrets," which reads, in part:

[Muckenfuss] agrees to not divulge any trade secrets of the Corporation. Trade secrets means any knowledge or information concerning any process, product, or customer of the Corporation and more generally any knowledge or information concerning any aspect of the business of the Corporation which court, if divulged to a direct or indirect competitor, adversely affect the business of the Corporation, its prospects or competitive position. Seller shall not use for his own benefit any trade secret of the Corporation in any manner whatsoever.

Despite its designation as a "Covenant Not to Divulge Trade Secrets," this section would substantially restrict Mucken-

fuss's competitive employment activities. Because it basically has the effect of a covenant not to compete, we must subject it to the same scrutiny as a covenant not to compete. Using those criteria, the restraint is unlimited in time and territory, and is far greater than necessary to protect any legitimate business interest. *See Cafe Assocs., Ltd. v. Gerngross*, 305 S.C. 6, 406 S.E. (2d) 162 (1991) (enforcing five-mile radius and five-year time restraint on activities of former owner of restaurant); *Sermons v. Caine & Estes Insur. Agency, Inc.*, 275 S.C. 506, 273 S.E. (2d) 338 (1980) (holding covenant restraining solicitation of existing customers "at any time" unenforceable as a matter of law); *Eastern Business Forms, Inc. v. Kistler*, 258 S.C. 429, 189 S.E. (2d) 22 (1972) (noncompetition agreements, while not favored, will be upheld if the territorial extent of the restraint and the period for which it will be imposed are reasonable); *Oxman v. Sherman*, 239 S.C. 218, 122 S.E. (2d) 559 (1961) (statewide restraint on competition held unenforceable where employee's solicitations had been in only two counties during his employment). An employer has no legitimate commercial interest in prohibiting competition in itself. *Almers v. South Carolina Nat'l Bank of Charleston*, 265 S.C. 48, 217 S.E. (2d) 135 (1975).

Moreover, the restraint is harsh and oppressive in curtailing the legitimate efforts of Muckenfuss to earn a livelihood. Muckenfuss, a high school graduate, has worked in the industrial chemical business since he completed high school. At a matter of fact, he began assisting his father, Bernard Muckenfuss, one of the original owners of Carolina Chemical, on a part-time basis while still in high school. When an employee leaves a job, he is entitled to take the skills and general knowledge he has either acquired or increased during his employment with him:

> [T]he right of an individual to follow and pursue the particular occupation for which he is best trained is a most fundamental right. Our society is extremely mobile and our free economy is based upon competition. One who has worked in a particular field cannot be compelled to erase from his mind all of the general skills, knowledge and expertise acquired through his experience. These skills are valuable to such employee in the market place for his ser-

vices. Restraints cannot be lightly placed upon his right to compete in the area of his greatest worth.

*ILG Industries v. Scott,* 49 Ill. (2d) 88, 273 N.E. (2d) 393, 396 (1971). The clause at issue here, if enforced, would prevent Muckenfuss from using the general skills and knowledge he acquired at Carolina Chemical.

Finally, the restraint is not reasonable from the standpoint of sound public policy because of its effects on both the employee and the competitive business environment. Accordingly, the trial judge erred in denying Muckenfuss's motions for a directed verdict on the breach of contract claim.[2]

Muckenfuss and Energen also argue the trial judge erred in denying their motions for directed verdict and for judgment notwithstanding the verdict because there was no evidence they used or disclosed any trade secret of Carolina Chemical under the common law definition of "trade secret." The threshold issue in any trade secrets case is not whether there was a confidential relationship or a breach of contract or some other kind of misappropriation, but whether there was a trade secret to be misappropriated. *Lowndes Prods., Inc. v. Brower,* 259 S.C. 322, 191 S.E. (2d) 761 (1972). Prior to the South Carolina General Assembly enacting the Uniform Trade Secrets Act in 1992, South Carolina courts had already approved the broad definition of trade secrets found in the Restatement (First) of Torts § 757 cmt. b. (1939):

A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. It differs from other secret information in a business in that it is not simply information as to single or ephemeral

---

[2] We note the Stock Redemption Agreement contained a separate Covenant Not to Compete, which restrained Muckenfuss from selling cleaning equipment or chemicals for a period of one year. It is undisputed Muckenfuss abided by this clause. All of the activities complained about here took place well after the end of the noncompetition period.

events in the conduct of the business. . . . The subject matter of a trade secret [must have] . . . a substantial element of secrecy . . . so that, except by the use of improper means, there would be difficulty in acquiring the information.

*Id.; see generally* Richard E. Day, *Protection of Trade Secrets in South Carolina*, 42 S.C.L. Rev. 689 (1991). However, this is not to say all business ideas *are* trade secrets. A trade secret must be secret. Restatement (First) of Torts § 757 cmt. b. In determining whether something is a trade secret, one must consider the extent to which the information is known outside of his business and the ease or difficulty with which the information could be properly acquired or duplicated by others. *Id.* Trade secret protection is limited. For instance, even matters that can be disclosed by reverse engineering[3] may not be protected as trade secrets. *SI Handling Systems, Inc. v. Heisley*, 753 F. (2d) 1244 (3d Cir. 1985).

The contractual provision at issue here does not identify any specific trade secrets; rather, it defines trade secrets so broadly that virtually all of the information Muckenfuss acquired during his employment would fall within its definition. *See Service Centers of Chicago, Inc. v. Minogue*, 180 Ill. App (3d) 447, 129 Ill. Dec. 367, 372, 535 N.E. (2d) 1132, 1137 (1989) ("By defining confidential information as essentially all of the information provided . . . the confidentiality agreement amounts . . . to a post-employment covenant not to compete which is completely unrestricted in duration or geographical scope."); *cf. AMP Inc. v. Fleischhacker*, 823 F. (2d) 1199 (7th Cir. 1987) (noting the risk plaintiffs run by producing long lists of general areas of information which contain unidentified trade secrets instead of identifying specific trade secrets). Therefore, the contract provision here is unenforceable as a matter of law.

Carolina Chemical alleges a combination of the following as evidence of misconduct: knowledge of the identity of Carolina Chemical's customers; knowledge of Carolina Chemical's pricing; and misappropriation of four product formulae (paint

---

[3] Reverse engineering means starting with a known product and "'working backward to divine the process which aided in its manufacture.'" *SI Handling*, 753 F. (2d) at 1255 (citation omitted).

thinner, bilge cleaner (coldwash), degreaser/safety solvent, concrete remover). Carolina Chemical does not claim Muckenfuss took actual customer lists, pricing lists, or formula cards with him. Rather, it alleges the misappropriation occurred in using knowledge he acquired during the 17 years he was employed with Carolina Chemical.

Viewed in the light most favorable to Carolina Chemical, the following evidence exists: Six months after the expiration of the noncompetition period under the Covenant Not to Compete, Muckenfuss began competing with Carolina Chemical. He contacted some of Carolina Chemical's non-exclusive customers. He made sales to some of these customers, and others, of products that were similar to products sold by Carolina Chemical. One of the products, paint thinner, is manufactured by neither Carolina Chemical nor Energen. The remaining three products are "built" by purchasing the raw materials, and then mixing, packaging, and selling them. Formulae for these three products are readily available from the suppliers of raw materials. Carolina Chemical's chemical expert analyzed and compared the products, finding them similar but not identical. Finally, there was also evidence Energen sold its similar products at lower prices than Carolina Chemical did. None of these acts, however, constitute misappropriation of a trade secret. *See AMP Inc. v. Fleischhacker*, 823 F. (2d) 1199 (7th Cir. 1987) (summarizing Illinois law and noting where former employee might be able to recollect pricing information, or where other than the exact formulae were used, no trade secret cause of action lies). Accordingly, the trial judge erred in failing to grant Muckenfuss's and Energen's motions for directed verdict and for judgment notwithstanding the verdict because no evidence was presented they used or disclosed any trade secret of Carolina Chemical.

Based on this disposition, we need not reach Muckenfuss's, Energen's, or Carolina Chemical's remaining issues on appeal. On remand, the trial judge is instructed to enter directed verdicts in favor of Muckenfuss and Energen, vacate the permanent injunction, and vacate the award of attorney fees.

Reversed and remanded.

HOWELL, C.J., concurs.

CURETON, J., dissents in separate opinion.

CURETON, Judge (dissenting):

The discussion that follows was originally written as the proposed majority opinion. Because I am the only panel judge who now believes the analysis is correct, I publish my proposed opinion with minor modifications as my dissent.

*Muckenfuss's and Energen's Appeal*

I.

The appellants argue the trial judge erred in denying their motions for a directed verdict and for judgment notwithstanding the verdict because there was no evidence presented at trial that they used or disclosed any trade secret of CCEC under the common law definition of "trade secret." I disagree. When deciding motions for a directed verdict or judgment notwithstanding the verdict, the trial judge must consider the evidence in the light most favorable to the nonmoving party. *Brady Dev. Co. v. Town of Hilton Head Island*, 312 S.C. 73, 439 S.E. (2d) 266 (1993) (citing *Dunsil v. E.M. Jones Chevrolet Co.*, 268 S.C. 291, 233 S.E. (2d) 101 (1977). A directed verdict or judgment notwithstanding the verdict should be granted where only one reasonable inference can be drawn from the evidence. *Brady*, 439 S.E. (2d) at 269. Where the evidence is susceptible of more than one reasonable inference, the motion should be denied. *Unlimited Servs., In. v. Macklen Enters.*, 303 S.C. 384, 401 S.E. (2d) 153 (1991).

Under South Carolina law, the threshold issue in any trade secret case is not whether there was a confidential relationship or a breach of contract or some other kind of misappropriation, but whether there was a trade secret to be misappropriated. *Lowndes Prods., Inc. v. Brower*, 259 S.C. 322, 191 S.E. (2d) 761 (1972); R. Day, *Protection of Trade Secrets in South Carolina*, 42 S.C.L. Rev. 689, 694 (1991).

The covenant not to divulge trade secrets contained in the Stock Redemption Agreement defines trade secrets as:

> ... any knowledge or information concerning any process, product, or customer of the Corporation and more generally any knowledge or information concerning any aspect of the business of the Corporation which could, if divulged to a direct or indirect competitor, adversely affect

the business of the Corporation, its prospects or competitive position.

Prior to the South Carolina General Assembly enacting the Uniform Trade Secrets Act in 1992, South Carolina courts had already approved the broad definition of trade secrets found in the Restatement (First) of Torts § 757 cmt.b (1939):

> A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. It differs from other secret information in a business in that it is not simply information as to single or ephemeral events in the conduct of the business.... [Further] the subject matter of a trade secret [must have]... a substantial element of secrecy ... so that, except by the use of improper means, there would be difficulty in acquiring the information.

*See Lowndes*, 259 S.C. 322, 191 S.E. (2d) 761 (1972).

The trial judge charged the jury only on the contract definition of trade secrets. The appellants argue the common law definition of trade secrets clearly contemplates the unauthorized or unlawful use of information that is privileged, secret, and not widely known in the industry, the possession of which gives its possessor a *competitive advantage* over competitors; whereas, the contract definition of trade secrets encompasses "any knowledge or information" concerning any process, customer, product or aspect of the business, which if divulged to a competitor would *adversely affect* the business of CCEC. The appellants argue the common law definition is vastly different from the contract definition in that its scope is more confined. Implicitly, the appellants concede the evidence may be sufficient to show a misappropriation of trade secrets under the contract definition, but argue CCEC's cause of action is at common law and we must look to the common law definition to ascertain whether there has been a misappropriation. The question therefore posited is whether the parties' contract de-

finition of trade secrets was properly applied to CCEC's common law cause of action.[1]

It is difficult, if not impossible, to state a precise definition of a trade secret. 20 S.C. Juris. *Intellectual Property* § 72 (1993). Indeed, the Restatement (First) of Torts concluded "[a]n exact definition of a trade secret is not possible." Restatement (First) of Torts § 757, cmt. b (1939). Almost any type of information may be entitled to protection as a trade secret under appropriate circumstances. 20 S.C. Juris. *Intellectual Property* § 77 (1993). While a written agreement is not essential to the protection of trade secrets, covenants not to divulge do provide the understanding between parties that certain information which has been or will be disclosed is confidential and privileged. 20 S.C. Juris. *Intellectual Property* §§ 75, 76. Therefore, to the extent the agreement between Muckenfuss and CCEC identified certain information as confidential or privileged, the parties are bound by their agreement unless the provision violates public policy. I therefore conclude that while the contract definition of trade secrets is arguably broader than the common law definition, the practical effect of the two under the facts of this case is the same. Thus, the appellants were not prejudiced by the failure of the trial court to charge the common law definition of trade secrets. *Hall v. Palmetto Enters. II*, 282 S.C. 87, 317 S.E. (2d) 140 (Ct. App. 1984).

Nevertheless, the appellants argue the information, products and processes at issue were widely known in the industry and, consequently, the parties could not by agreement make their disclosure confidential so as to qualify as trade secrets. I disagree. The evidence was conflicting as to whether the information, products and processes at issue were widely known in the industry. I would find the evidence sufficient to create a jury issue whether Muckenfuss and Energen disclosed trade secrets of CCEC under both the common law and contract definition of trade secrets. CCEC introduced extensive testimony and documentary evidence regarding particular chemical formulations, products, and customers that Muckenfuss had allegedly divulged to Energen. These included various

---

[1] Energen does not argue that it is not bound by the contract definition because it is not a party to the Stock Redemption Agreement.

products manufactured by CCEC but not previously manufactured by Energen until Muckenfuss was hired, and the identity of CCEC's customers while Muckenfuss was still employed by CCEC and with whom Energen began doing business after it employed Muckenfuss. Thus, there was ample evidence in the record to support the trial judge's denial of the appellant's motions for a directed verdict and for judgment notwithstanding the verdict.

## II.

Muckenfuss next argues the trial court should have granted his motions for a directed verdict and for judgment notwithstanding the verdict on the breach of contract cause of action because the covenant not to divulge trade secrets equates to a covenant not to compete and is an illegal restraint of trade. He urges this court to invalidate the covenant because it is not necessary to protect any legitimate business interests of CCEC; is not reasonably limited in time and place; and, is unduly harsh and oppressive to him in that it denies him the right to utilize his occupational skills in the furtherance of his profession. Agreements not to divulge confidential information, unlike noncompetition agreements, may be valid and enforceable under certain circumstances even though they are unlimited as to time and place. *See Eden Hannon & Co. v. Sumitomo Trust & Banking Co.*, 914 F. (2d) 556 (4th Cir. 1990), *cert. denied*, 499 U.S. 947, 111 S.Ct. 1414, 113 L.Ed. (2d) 467 (1991). As a matter of fairness, an ex-employer should be protected from having its trade secrets misappropriated by an ex-employee unless the "granting of such protection will unduly hamstring the ex-employee in the practice of his occupation." *Futurecraft Corp. v. Clary Corp.*, 205 Cal. App. (2d) 279, 288, 23 Cal. Rptr. 198 (Cal. App. 1962). The difficulty in applying this rule, as noted by Professor Day, "is in determining what information an ex-employee can use with impunity."[2] T. Scranton and C. Wilson in their law review article: *Postemployment Covenants Not To Compete In South Carolina; Wizards And Dragons In The Kingdom*, 42 S.C.L. Rev. 657, 681-682 (1991), discuss the treatment of noncompetition agreements vis-à-vis agreements not to disclose by our courts:

---

[2] 42 S.C.L. Rev. at 705.

Courts that have considered an employee's duty not to disclose confidential information or trade secrets of an employer have uniformly attempted to find and enforce that duty. In this area, courts impose no presumptions against employers and do not subject the employee's promise or covenant not to disclose to a rigid test or analysis. Rather, recognizing the public policy reasons for finding such covenants to be presumed valid, courts seek to enforce them.

The method of analysis South Carolina courts apply to covenants not to disclose information relative to that applied to employee competition covenants is not consistent. . . . When South Carolina courts consider the enforceability of a covenant not to disclose, they do not attempt to dissect the contractual language and factual circumstances under the reasonableness test. Such preferential treatment may result from courts' recognition of the importance of the proprietary information of a business, a factor which has never been cited as a basis for upholding an employee competition covenant in South Carolina.

It is not clear what a South Carolina court would do if it faced an employee competition covenant side-by-side with a nondisclosure covenant in an employment agreement. Ironically, a strong argument could be made that the former is unenforceable, but the latter should be upheld. The practical effect on the employer, however, could be the same.

While I think a reasonableness test should be employed in determining the enforceability of covenants not to disclose, I would not find the instant covenant so unreasonable as to warrant a court's refusal to enforce it on public policy grounds. This is especially so in light of the fact the parties by agreement agreed to a limited enforcement of the covenant by the court.[3] I conclude the evidence supports the finding that some provision of the covenant not to divulge has been

---

[3] The agreement provides that "[i]f any part of the covenant set forth above should, for any reason whatsoever, be declared invalid by a court of competent jurisdiction, the validity and enforceability of the remainder of the covenant shall not thereby be adversely affected."

breached. Therefore, I would find no error in the trial court's refusal to grant Muckenfuss's motions.

### III.

Muckenfuss further argues the trial court erred in failing to grant a directed verdict to him because no consideration was paid for the covenant not to divulge trade secrets.[4] I disagree. Initially, I note the Stock Redemption Agreement indicates at its beginning that "in consideration of the premises and the mutual covenants herein contained, the parties hereto agree to," among other things, covenant not to divulge trade secrets. Clearly, under contract law, mutual promises afford sufficient legal consideration for the support of each other. *Evatt v. Campbell*, 234 S.C. 1, 106 S.E. (2d) 447 (1959). In *Lowndes*, 259 S.C. 322, 191 S.E. (2d) 761, the Court found a misappropriation of trade secrets and allowed a claim for damages against former employees even though there was no agreement not to divulge or contracts of employment involved. Thus, I would decline to hold a covenant not to divulge trade secrets which is part of an otherwise valid agreement must be supported by separate consideration to be valid and enforceable.

### IV.

The appellants next argue the trial court abused its discretion in imposing a five-year injunction prohibiting them from selling four products in Charleston County. I would affirm as modified. A preliminary injunction issued by Judge Bristow has been in effect in this case since June 1991. A November 1991 amended preliminary injunction prohibits Muckenfuss from divulging any trade secrets of CCEC's, and prohibits him from selling products offered by Energen to any person or company which was not already a customer of Energen's prior to March 15, 1991. The November preliminary injunction also prohibits Energen from contacting or selling to any customer of CCEC's which was not already a customer of Energen's prior to March 15, 1991.

The permanent injunction issued July 12, 1994 prohibits the appellants from selling cold wash, paint thinner, acid wash

---

[4] The Stock Redemption Agreement states: "The parties agree that the purchase price shall be allocated as follows: $100,000.00 for the stock purchase price, and $27,000.00 as the consideration for the covenant not to compete."

having a phosphoric base, and safety solvent to any customers in Charleston County for a period of five years. Having concluded there is evidence the appellants misappropriated CCEC's trade secrets, the question becomes whether an injunction of some nature is appropriated. Although perpetual injunctions may, under certain circumstances be appropriate, the clear trend of authority is to provide injunctive relief only for the length of time necessary to eliminate "the temporal advantage over good faith competitors gained by a misappropriator." 20 S.C. Juris. *Intellectual Property* § 82; *see K-2 Ski Co. v. Head Ski Co.*, 506 F. (2d) 471, 474-75 (9th Cir. 1974). The trial court's order does not approach this issue in these terms. While I conclude the permanent injunction more appropriate in its duration, product limitation, and geographic scope than the temporary injunction, I would agree with the appellants that five years is excessive in duration and not necessary to protect a legitimate interest of CCEC. This conclusion is based on the fact that (1) the appellants have been continuously enjoined under Judge Bristow's broader preliminary injunction since 1991; (2) the damages award presumably compensated CCEC for all damages it sustained from the appellants' use of the confidential information; and (3) there is a clear inference from the evidence that the misappropriated formulas and customer information were only marginally secret in the industry. I therefore would modify the time limit of the permanent injunction, reducing it from five years to a period of three years from the date of issue.

## V.

The appellants next argue the trial court erred in interpreting the jury's damages award causing CCEC to receive a double recovery. I agree. The jury returned a verdict in favor of CCEC and against both Muckenfuss and Energen for $37,500.00 on the common law bad faith and misappropriation of trade secrets causes of action, and a verdict for $37,500.00 against Muckenfuss only for breach of the covenant not to divulge trade secrets. The trial court interpreted the jury awards as a total verdict of $75,000.00 for CCEC. Muckenfuss then filed a motion to elect remedies, which was denied. Muckenfuss now argues the verdict should have been construed as a total verdict of only $37,500.00 for CCEC because CCEC would otherwise receive a double recovery. I agree.

Both causes of action for which the jury returned verdicts concerned the misappropriation of trade secrets. A plaintiff may recover his actual damages only once for a single wrong. *Taylor v. Hoppin' Johns, Inc.*, 304 S.C. 471, 405 S.E. (2d) 410 (Ct. App. 1991); *Inman v. Imperial Chrysler-Plymouth.*, 303 S.C. 10, 397 S.E. (2d) 774 (Ct. App. 1990).

This interpretation of the verdict is consistent with statements made by CCEC's own attorney during closing arguments. Counsel for CCEC stated that in filling out the three verdict forms, the jury could find actual damages on all three forms, but CCEC would recover only once for actual damages:

> [A]nd I will tell you we can only recover just once. Even if you did that on your verdict forms and answer all three verdict forms with an actual damage amount, we won't recover three verdicts. The law is such—and we're not entitled to it—the law is such that you can only have one recovery for actual damages, no matter how many times you put it on the verdict form. It's only a one time thing, and Carolina Chemical is not entitled to more than one amount for actual damages. No question about that, and that is the limit they are entitled to.

Arguably, the jury took CCEC's counsel at his word and relied on his representation that even if the verdict forms showed an award of actual damages on more than one cause of action, CCEC would only be entitled to one recovery.[5] I would reversed the trial court's denial of Muckenfuss's motion to reform the verdict to reflect a total verdict for CCEC in the amount of $37,500.00 against both appellants.

## VI.

Finally, the appellants argue the trial court erred in awarding attorney fees to CCEC in the amount of $74,657.00 and costs of $6,008.03 because such amounts exceed the damages award. While not every attorney's fee award will be set aside simply because it exceeds the damages award, I agree that under the facts of this case the award is recessive. The Stock Redemption Agreement provides that CCEC may recover reasonable attorney fees in the event Muckenfuss breaches

---

[5] No punitive damages were awarded CCEC.

the covenant not to divulge trade secrets. Where there is a contract providing for "reasonable attorney's fees," the award of attorney fees will be left to the discretion of the trial judge. *Baron Data Systems, Inc. v. Loter*, 297 S.C. 382, 384, 377 S.E. (2d) 296, 297 (1989). When awarding reasonable attorney fees, the court should consider six factors: the nature, extent, and difficulty of the legal services rendered, the time and labor necessarily devoted to the case, the professional standing of counsel, the contingency of compensation, the fee customarily charged in the locality for similar legal services, and the beneficial results obtained. *Id.*

In addressing the attorney fee award, the trial judge stated, "[t]he Court has reviewed the applicable tests for attorney's fees under the case law and finds the criteria to be met as a matter of fact." Under the facts of this case, after consideration of the *Baron Data* factors, and in light of the fact I would reduce the amount of CCEC's verdict, I conclude the attorney fees should also be reduced to $35,000.00. The award of costs in the amount of $6,008.03 should be affirmed. *See Glasscock v. Glasscock*, 304 S.C. 158, 403 S.E. (2d) 313 (1991) (Supreme Court made its own finding as to what was a reasonable award and affirmed as modified to reflect a reduction in the award); *Cockrell v. Trustees of School Dist. 20*, 299 S.C. 155, 382 S.E. (2d) 923 (1989) (Supreme Court modified attorney fees on appeal).

## *CCEC's Appeal*

### I.

CCEC argues the trial judge improperly restricted the product and geographic scope of the permanent injunction by failing to adopt the preliminary injunction at the permanent injunction. I disagree for the reasons discussed above.

### II.

CCEC next argues the trial court improperly denied its motions for a new trial *nisi additur*, a new trial limited to the issue of damages, a new trial absolute, or for judgment notwithstanding the verdict. I disagree.

The trial judge alone has the power to grant a new trial *nisi* when he finds the amount of the verdict is merely inadequate or excessive. The denial of a motion for a new trial *nisi* is

within the trial judge's discretion and will not be reversed on appeal absent an abuse of discretion. *O'Neal v. Bowles,* 314 S.C. 525, 431 S.E. (2d) 555 (1993). When the verdict is so grossly excessive or inadequate that the amount awarded is so shockingly disproportionate to the injuries as to indicate that the jury was moved or actuated by passion, caprice, prejudice, or other considerations not found in the evidence, it must be set aside absolutely by the trial judge. *Allstate Ins. Co. v. Durham,* 314 S.C. 529, 431 S.E. (2d) 557 (1993).

The criteria for appellate review of a trial court's decisions on motions for direction of verdicts and for judgments notwithstanding the verdict is discussed above. In the present case, the posttrial motions were properly denied by the trial judge. The jury was presented with conflicting testimony regarding the cause and extent of the damages suffered by CCEC. Dr. Woodside, an economist who testified on behalf of CCEC, stated he did not know whether CCEC's loss of profits was associated with any particular product. In fact, CCEC's loss of business was attributable to many factors, including the general competitiveness of the market. Finally, Dr. Woodside admitted that Energen's upward performance trend and CCEC's downward performance trend began before Muckenfuss went to work for Energen. Hence, the verdict is not unsupported by evidence, and the trial judge did not err in denying CCEC's posttrial motions.

Accordingly, for the foregoing reasons I would affirm in part, reverse in part and modify in part.